EDWARD C. LEE and MARY C. LEE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lee v. Commissioner
Docket No. 3913-83.
United States Tax Court
T.C. Memo 1986-294; 1986 Tax Ct. Memo LEXIS 314; 51 T.C.M. (CCH) 1438; T.C.M. (RIA) 86294; July 17, 1986. Edward C. Lee, pro se. Wayne R. Appleman, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6653(a)
1976
$4,733 $797
$664
1977
4,190
1,048 678
1978
4,541
1,135 686
The issues for decision are: (1) Whether petitioners had gross income as determined by respondent for the years 1976, 1977, and 1978. (2) Whether petitioners are entitled to business bad debt deductions for amounts loaned to Spellbound U.S.A., Inc. during the years 1976, 1977 and 1978. (3) Whether *317 petitioners are entitled to a section 165 deduction on the sale of a seaplane for the year 1978. (4) Whether petitioners' 1978 disposition of Hawaii real estate qualified for section 1031 treatment. (5) Whether petitioners had capital gains from the sale of gold and silver coins for the years 1977 and 1978. (6) Whether petitioners are liable for the additions to tax pursuant to section 6651(a)(1) for failure to file timely returns and section 6653(a) for negligence or intentional disregard of rules and regulations for the years 1976, 1977, and 1978. Some of the facts have been stipulated and are found accordingly. Petitioner Edward C. Lee (hereinafter referred to as "petitioner") resided in Port Angeles, Washington, when the petition was filed in this case. Petitioner Mary C. Lee resided in Ocala, Florida, at that time. Petitioners were husband and wife during the years in issue. Issue 1. Gross Income
FINDINGS OF FACT Petitioner was employed as a pilot by Delta Airlines from 1969 through 1978. He received income *318 from his employment at Delta Airlines during all of the years in issue and from other sources as well during the years 1977 and 1978. OPINION Petitioners raise as an issue whether they had any income which was taxable under the Internal Revenue Code. Essentially, they argue that the Federal Reserve notes they received in the years in issue are not reportable as income at their face value. It has been consistently held, however, that Federal Reserve notes constitute income at face value. [2] See United States v. Wangrud,533 F.2d 495 (9th Cir. 1976), cert. denied 429 U.S. 818 (1976); Hatfield v. Commissioner,68 T.C. 895, 897 (1977); Sibla v. Commissioner,68 T.C. 422, 430-431 (1977), affd. without discussion of the issue 611 F.2d 1260 (9th Cir. 1980); Gajewski v. Commissioner,67 T.C. 181, 193-194 (1976), affd. without opinion 578 F.2d 1383 (8th Cir. 1978). We will not waste our time discussing such hollow arguments which have been considered and rejected on numerous occasions.
*319 Accordingly, we hold that in the years in issue petitioners had gross income which was taxable under the Internal Revenue Code. Issue 2. Loss on Loans to Spellbound U.S.A., Inc.
FINDINGS OF FACT During the period 1971 through 1973, petitioners loaned $31,159 to Spellbound U.S.A., Inc. Petitioner was appointed vice president and a director of Spellbound in 1971. [3] Neither petitioner owned stock in Spellbound and petitioner received no salary or compensation for acting as an officer and director. Petitioners' only expected profit from their involvement with Spellbound was the interest charged on the loans. Spellbound was created and wholly owned by Sidney Hollister and Roberta Hudak.Spellbound's business activities included: (1) operating a hot dog *320 stand in a Denver shopping center; (2) developing a mobile cart hot dog stand that was designed to be franchised; (3) operating a motel in Alamosa, Colorado; (4) operating a bar and restaurant in Southfork, Colorado; and, (5) developing modular homes on land owned in Southfork. Petitioner made several trips to Spellbound's Colorado business locations. Sometime in 1977 petitioners lost contact with Spellbound and its other officers. Petitioners did not know the location of Hollister and Hudak, the owners and remaining officers of Spellbound, and considered the debts to be uncollectible. Petitioners deducted the loss on the debts as business losses in the years 1976, 1977, and 1978 in the amounts of $12,000, $12,000, and $7,159, respectively. They used this allocation of the loss because it minimized their tax liability for these years. In his notice of deficiency, respondent determined that this loss was allowable only as a short-term capital loss in the year 1976 but did not dispute the amount of the loss. OPINION The primary issue is whether petitioners' loans to Spellbound are deductible as business bad debts or nonbusiness bad debts. *321 The Supreme Court has held that, "a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all." Putnam v. Commissioner,352 U.S. 82, 88 (1956). Section 166(a) provides, in part, that "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year." Section 166(d)(1) provides, however, that in the case of an individual, section 166(a) shall not apply to nonbusiness debts and that loss from the worthlessness of such debts shall be treated as a short-term capital loss. Section 166(d)(2) defines "nonbusiness debt" as "a debt other than -- (A) a debt created or acquired * * * in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." For a bad debt to have the requisite "proximate" relationship to a taxpayer's trade or business, its creation must have been dominantly motivated by such trade or business. United States v. Generes,405 U.S. 93, 103 (1972). Petitioners contend that they have loaned money to two corporations with the intent of profiting from *322 the loans and business activities. They further contend that the loans were directly related to petitioner's business as an officer and director of Spellbound and another corporation, their business of making loans or financing businesses, or their business of promoting corporate enterprises. Petitioners concluded that they are entitled to a business bad debt deduction for the amounts loaned to Spellbound. They also contend that the debts became uncollectible in 1977, although they attempted to deduct portions of the loss in 1976, 1977, and 1978. Respondent contends that while petitioners intended to profit from their loans to Spellbound by earning interest, they were not in the business of making loans, financing businesses, or promoting corporate enterprises. Respondent notes that petitioner received no compensation for acting as an officer and director of Spellbound. Respondent reasons from the above that petitioners' activities with respect to the loans were in the nature of investment and not in the nature of carrying on a business. Respondent concludes that petitioners are limited to deducting their loss as a nonbusiness bad debt. Initially, respondent also contended *323 that the debt had become uncollectible in 1976, but he has apparently conceded on brief that the proper year for deducting the loss was 1977. [4] We agree with respondent as to the character of the loss. Petitioners have the burden of proof with respect to the characterization of the loss. Rule 142(a). [5] Petitioners must, therefore, provide sufficient evidence to prove that (1) they were engaged in a trade or business, and (2) the creation of the debt from which the loss arose was dominately motivated by such trade or business. Petitioners assert that their loans to Spellbound *324 were proximately related to (1) their business of making loans or financing businesses, (2) their business of promoting corporate enterprises, or (3) petitioner's trade of being a corporate executive. Relevant to petitioners' claim that they were in the business of making loans or financing businesses is our statement in Sales v. Commissioner,37 T.C. 576, 580 (1961), that bad debts are deductible as business bad debts only in "exceptional situations where the taxpayer's activities in making loans have been regarded as so extensive and continuous as to elevate that activity to the status of a separate business." The record in this case does not indicate the number of loans made to Spellbound nor does it show that any significant business activities were involved in the making of the loans. Petitioners have asserted in their brief that, in addition to their loans to Spellbound, they made loans to another corporation. The record, however, contains no evidence of loans to any corporation other than Spellbound. Petitioners have failed to show that their activities *325 in making loans were so "extensive and continuous" as to constitute a separate business. Similarly, petitioners' claim that they were in the business of promoting corporate enterprises is not supported by the record. Petitioner made several trips to Spellbound's Colorado business locations but there is no indication in the record of his activities while on these trips. More importantly, petitioners have failed to demonstrate that such promotional activities would advance any business interest which they possess. They have not shown that they held an interest in Spellbound as property for sale to customers in the ordinary course of business, and, as we stated earlier, they have not shown that they were in the business of making loans. Petitioner's claim that he was in the trade or business of being an employee of Spellbound is also unsupported. With respect to being an employee of a debtor corporation, it was stated in Whipple v. Commissioner,373 U.S. 193, 204 (1963): Nor need we consider or deal with those cases which hold that working as a corporate executive for a salary may be a trade or business * * * [T]he contention would be groundless on this record *326 since it was not shown that [taxpayer] has collected a salary * * * or that he was owed one. Moreover, there is no proof * * * that the loan was necessary to keep his job or was otherwise proximately related to maintaining his trade or business as an employee. * * * [Fn. reference omitted; citations omitted.] In this case petitioner testified that he was not compensated, nor due compensation, for acting as a director and vice president of Spellbound. Petitioners admitted on brief that the positions entailed no specific duties. It is uncertain whether the evidence before us would establish that petitioner's employment with Spellbound was bona fide. Clearly, the evidence does not establish that petitioner's employment rose to the level of a trade or business. Petitioners have failed to show that they were engaged in any trade or business to which the loans to Spellbound were proximately related. Accordingly, we hold that they are limited to deducting their loss on these loans as nonbusiness bad debts in 1977. Issue 3. Loss on Sale of Seaplane
FINDINGS OF FACT In December 1974, petitioner purchased a seaplane as a first step toward starting a commercial seaplane *327 operation in the Port Angeles area. Purchase of an aircraft is a prerequisite to obtaining an air taxi certificate from the F.A.A. The seaplane was purchased in Vermont with petitioner's personal funds. He had planned to fly the seaplane from Vermont to Port Angeles and there form a corporation which would own and operate the seaplane. On the flight from Vermont to the northwest, however, the seaplane developed engine problems. Petitioner incurred substantial expenses in overhauling the seaplane's engine, and it was not airworthy for approximately 3 years following its purchase. Before petitioner's seaplane was again airworthy, someone else had put a seaplane operation into service in the Port Angeles area and, as a result, petitioner decided to sell his seaplane. Petitioner sold the seaplane in 1978 at a loss. In December 1975, petitioner formed ECL, Inc. with the intention of having it own and operate the seaplane. Because the seaplane was never available for operation in the Port Angeles area, petitioner did not transfer title to ECL. In 1979, petitioner changed the name of ECL to Peninsula Airlines, Inc. and began a commuter service between Port Angeles and Seattle. Peninsula *328 Airlines ceased operations in May of 1980. Petitioners claimed a business loss for the tax year 1978 equal to the loss realized on the sale of the plane and the expenses incurred in making it airworthy. Respondent disallowed the loss. OPINION At issue is whether petitioners' loss on the sale of the seaplane is deductible under section 165. Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(c), however, limits the deduction by individuals of noncasualty losses to (1) losses incurred in a trade or business or (2) losses incurred in transactions entered into for profit. Petitioner contends that the loss on the sale of the seaplane was an expense incurred in attempting to start a commercial seaplane service and that his motive in attempting to start up this service was to make a profit. Petitioner argues that his loss should be deductible as a business expense. Conversely, respondent contends that petitioner is not entitled to a business loss deduction under section 165(c)(1) because he was engaged in neither the business of buying and selling Planes nor the business of operating *329 a seaplane service. Respondent further contends that petitioner is not entitled to a deduction under section 165(c)(2) for a loss incurred on a transaction entered into for profit because petitioner intended to contribute the plane to ECL, Inc. and did not intend to profit directly by its sale. Respondent also contends that, even if the loss were allowable, it would not be allowable until 1980 when ECL ceased operations. Respondent has not disputed the amount of the loss. We hold that petitioners are entitled to a loss deduction in 1978 under section 165(c)(2). At the time the seaplane was sold petitioner had not established a trade or business in which the seaplane could be used, nor was petitioner in the business of selling seaplanes. Respondent, therefore, is correct in contending that a deduction is not available to petitioners under section 165(c)(1). For a loss to be within section 165(c)(2), it must be incurred in a "transaction" and the transaction must be induced primarily by a profit motive. Seed v. Commissioner,52 T.C. 880, 885 (1969). Respondent seems to contend that the purchase of property for contribution to a corporation owned by the purchaser *330 is per se not a transaction induced primarily by a profit motive because there is no intention to directly profit from the property. In Horner v. Commissioner,35 T.C. 231 (1960), the taxpayer purchased merchandise, using his own line of credit, for resale by his corporation. His expectation of profit was by way of the corporation's realizing a profit on the resale. When the corporation became insolvent the taxpayer was forced to pay the balance due on merchandise which had been transferred to the corporation. In holding that the taxpayer was entitled to a section 165(c)(2) deduction, we stated: Businesses or transactions entered into for profit can consist of many different types of activities. If one enters into the activity of furnishing a corporation with goods to sell, upon his own credit, with the expectation of deriving gain when the goods are sold he certainly is engaging in a transaction entered into for profit. In this case, the expectation was that the profits would come * * * either as salary as president and general manager, from dividends on his stock, or as an increase in the value of his stock. [ *331 Horner v. Commissioner,supra at 236.] In the case before us, petitioner purchased the property with the intention of contributing it to the corporation and having the corporation realize a profit from the use of the property. As in Horner, the expected profits would presumably reach petitioner as either wages, dividends, or appreciation in the value of his stock. For the above reasons, we believe that petitioner had the requisite profit motive to entitle him to a loss deduction under section 165(c)(2). Because the seaplane was not held in a trade or business, this loss is a capital loss. Sections 1221, 1222. Respondent further contends, however, that even if a loss is allowable it should not be allowed until 1980, the year in which ECL ceased operations. This is apparently based either on the idea that petitioner made a constructive contribution of the seaplane to ECL or that ECL had become liable to petitioner for his costs incurred in purchasing the seaplane. There is no evidence in this case that ECL ever acquired any rights or obligations with respect to the seaplane. Clearly, petitioner realized a loss on the sale of the seaplane and the loss *332 is one described in section 165(c)(2). Section 1001(c) states that, "[e]xcept as otherwise provided in this subtitle, the entire amount of the gain or loss * * * on the sale or exchange of property shall be recognized." Respondent has failed to point out any provision which would prevent petitioner from properly recognizing his loss in the year of sale. Therefore, we conclude that petitioners are entitled to deduct the loss in 1978. Issue 4. Gain on Disposition of Hawaii Real Estate
FINDINGS OF FACT In 1961, petitioners purchased five parcels of land in Hawaii. The land was classified as agricultural by the State Tax Commissioner. In November 1977, petitioners purchased a farm in Washington from Ronald and Heidi Craig. In June 1978, petitioners sold each of the five parcels in Hawaii by statutory warranty deed. Each parcel was sold to a different purchaser but the deeds were executed on the same day. The proceeds from the sale of the land in Hawaii were transferred directly to Ronald and Heidi Craig as part of the purchase price of the Washington farm. The proceeds did not pass through petitioners' hands. None of the purchasers of the land in Hawaii were related *333 to the sellers of the land in Washington. Petitioners realized a gain on the sale of the property in Hawaii. They did not, however, report this gain. Respondent determined that the gain should have been reported in 1978. OPINION The issue is whether the gain realized by the petitioners on the sale of their land in Hawaii is within the nonrecognition provisions of section 1031. Section 1031 provides that, "[n]o gain or loss shall be recognized if property held for productive use in a trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in a trade or business or for investment." Petitioners contend that the properties they purchased and sold were like kind and were held for investment or for productive use in a trade or business. They further contend that the purchase and sale were handled by a real estate broker as a single transaction and that, therefore, the gain realized on the sale of the Hawaii property was within the nonrecognition provisions of section 1031. Petitioners do not dispute the amount of the gain determined by respondent. Respondent contends that these transactions were a sale *334 of one property for cash followed by a separate investment of the proceeds and that such a transaction is not an exchange as required by section 1031. Respondent further contends that petitioners have failed to establish that the purchased farm was held for investment or for use in a trade or business. Respondent concludes that petitioners must recognize the gain on the sale of the Hawaii land in 1978. We agree with respondent. Section 1031 has three requirements: (1) there must be an exchange; (2) the properties exchanged must be of like kind; and, (3) the property transferred and the property received must be held by the taxpayer either for use in a trade or business or for investment. Respondent has not argued in this case that the properties transferred were not of like kind. Respondent's regulations provide that if a person "exchanges city real estate for a ranch or farm, or exchanges a leasehold of a fee with 30 years or more to run for real estate, or exchanges improved real estate for unimproved real estate," the properties exchanged are of like kind. Section 1.1031(a)-1(c), Income Tax Regs. The property transferred and the property received in this case were both *335 real estate and were clearly of like kind within the meaning of section 1031. Respondent contends that there was no exchange in this case. An essential prerequisite for nonrecognition treatment under section 1031 is that there be an "exchange" of properties. A sale of one property for cash followed by a separate investment of the proceeds in like kind property does not qualify as an exchange. Barker v. Commissioner,74 T.C. 555, 560-561 (1980). But in determining whether an exchange has occurred we look to the substance of a transaction rather than to the form in which it is cast. Biggs v. Commissioner,69 T.C. 905, 914 (1978), affd. 632 F.2d 1171 (5th Cir. 1980). Where, as here, the transaction is a so-called "three-corner" transaction, contractual interdependence is not required. Biggs v. Commissioner,supra at 914. Such a transaction is within the ambit of section 1031 if the taxpayer's transfer and receipt of property "were interdependent parts of an overall plan, the result of which was an exchange of like kind properties." *336 Biggs v. Commissioner,supra at 914. Petitioners must demonstrate that the transfers of property in this case were interdependent parts of an overall plan in order for such transfers to constitute an "exchange" within the meaning of section 1031. The record in this case is nearly devoid of information about the interrelationship of the sales of the Hawaii property and the purchase of the Washington farm. The statutory warranty deeds executed upon the sale of the Hawaii property, entered by petitioners as exhibits, make no reference to the transfer or transferors of the Washington farm. Similarly, the escrow agreement and sales contract executed upon the purchase of the Washington farm, also entered by petitioners as exhibits, make no reference to the transfer or transferees of the Hawaii property. The purchase of the Washington farm occurred more than 7 months before the sale of the Hawaii property and petitioners have failed to show that the sale of the Hawaii property was even contemplated at the time of the purchase of the Washington farm. The only evidence showing a relationship between these transactions, other than petitioners' participation in them, is *337 petitioner's testimony that the proceeds from the sale of the Hawaii land went directly to the sellers of the Washington farm. This evidence establishes nothing more than that the proceeds of the sale were used to pay a preexisting obligation of petitioners. The burden of proof is on petitioners to show that an exchange occurred within the meaning of section 1031. Rule 142(a). Petitioners have failed to satisfy this burden. Petitioners also have failed to prove that the property acquired, the Washington farm, was to be held for productive use in a trade or business or for investment. The record contains no evidence as to the actual use of the farm. Petitioner testified that the land was classified as agricultural by either the State or county but this does not establish that the farm was, or was intended to be, used for agricultural purposes. Nor does the label "farm" tend to prove that the land was used for other than personal uses. Petitioners have not demonstrated that the sale of the Hawaii property satisfied the requirements of section 1031. Accordingly, we hold that petitioners must recognize their gain on the sale of the Hawaii property in 1978. Issue 5. Gains *338 from Sales of Gold and Silver Coins
FINDINGS OF FACT On February 14, 1977, petitioners purchased 44 South African krugerands and 2 bags of silver coins from North American Coin and Currency, Ltd. of Phoenix, Arizona. In May and August of 1977, petitioners sold the two bags of silver at a gain. On January 12, 1978, petitioners sold the 44 krugerands at a gain. Petitioners did not report these gains as income in 1977 or 1978. Respondent determined that these gains should have been reported as short-term capital gains in 1977 and 1978. OPINION The issue is whether petitioners must include the gains on the sales of these coins as income for 1977 and 1978. Petitioners assert on brief that they received checks, not money, upon the sales of these coins. They contend that checks are personal property and, therefore, their gain must be computed using the fair market value of the checks. Petitioners conclude that because respondent failed to determine the fair market value of the checks, they are not required to include in income any gain from these sales. Respondent contends that petitioners have the burden of proving that the fair market value of the checks differed from *339 their face value. He further contends that petitioners have failed to satisfy this burden of proof and that, therefore, they must include in income gain computed by using the face amount of the checks. We agree with respondent. Respondent's determination of a deficiency is presumptively correct and the burden is on petitioners to overcome this presumption. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Petitioners have offered no evidence to substantiate their claim that they received checks, rather than cash, on the sale of the coins. Prior to submitting their brief, petitioners' only objection to respondent's determination of gain was based on their claim that Federal Reserve notes are not legal dollars. As we stated earlier, this claim is completely without merit. On cross-examination, petitioner stated that, aside from his claim as to the status of Federal Reserve notes, the numbers assigned in respondent's letter of deficiency correctly represent petitioners' transactions in gold and silver coins during 1977 and 1978. While petitioner's statement was somewhat ambiguous, it seems to us to constitute an admission as to the accuracy of respondent's *340 determination of the amounts realized on the sales. Regardless, petitioners have failed to overcome the presumption that respondent's deficiency determination is correct with respect to their sales of gold and silver coins in 1977 and 1978. Accordingly, we hold that petitioners must include in income for 1977 and 1978 the gains realized on their sales of gold and silver coins. Issue 6. Additions to Tax Pursuant to Section 6651(a) and Section 6653(a)
FINDINGS OF FACT Petitioner Edward Lee separately filed a Form 1040 (U.S. Individual Income Tax Return) with the Internal Revenue Service for the taxable year 1976. This form was received by the Internal Revenue Service on April 15, 1977. The form was signed by petitioner but stated only his name, address, and social security number. The spaces provided for information relating to income contained asterisks referencing a statement of objection at the bottom of the form. The two-line statement of objection purported to be a "specific objection" based on the Fifth Amendment, the theory that Federal Reserve notes are not United States dollars as defined by law, and the First, Fourth, Seventh, Eighth, Ninth, Tenth, Thirteenth, *341 Fourteenth, and Sixteenth Amendments. The remaining spaces on the form either referenced similar objections, contained the word "NONE", or were left blank. The spaces provided for declaring income amounts all contained asterisks. The word "NONE" did not appear in any of these spaces. Documents attached to the Form 1040 raised various constitutional and political objections to income tax returns and taxation of Federal Reserve notes. Also placed on the return was the statement, "I offer to amend or refile this return exactly as you wish it, if you will please show me how to do so without waiving my Constitutional rights." No information relating to the computation of tax liability was included. Prior to April 15, 1978, respondent received a Form 1040 separately filed by petitioner Edward Lee for the taxable year 1977. The form was signed and was filled out similar to that filed for 1976, but in place of the asterisks the spaces contained the phrase "OBJECT 5th." A statement at the bottom of the form explained that this phrase referred to an objection which was identical to the objection made on the form filed for 1976. Similar documents were attached to the form and an identical *342 offer to amend or refile was made on the form. On April 17, 1979, respondent received a Form 1040 separately filed by petitioner for the taxable year 1978. This form was signed by petitioner and listed petitioner's name, social security number, and claimed two exemptions. However, the form did not list petitioner's address. The remainder of the form was filled out similar to those filed for the previous 2 years with asterisks placed in most of the spaces. The same objection was made on the bottom of the form and the same offer to amend or refile was made at the top of the form. Similar documents were attached to the form. In 1980, petitioner again filed a Form 1040 for each of the years 1976, 1977, and 1978. These forms designated filing status as married filing joint return but the spaces provided for spouse's signature indicated "out of state." These forms did include information necessary for computing petitioner's tax liability. Respondent received the form for 1976 on October 8, 1980, and the forms for 1977 and 1978 on June 19, 1980. OPINION The issue is whether petitioners are liable for the additions to tax pursuant to section 6651(a)(1) for failure to file timely *343 returns and section 6653(a) for negligence or intentional disregard of rules and regulations for the years 1976, 1977, and 1978. Section 6651(a)(1) imposes an addition to tax for failure to timely file a return unless the taxpayer shows that such failure was due to reasonable cause and not willful neglect. Section 6653(a) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Respondent contends that the Forms 1040 filed by petitioner for the years 1976, 1977, and 1978 were not income tax returns within the meaning of the Internal Revenue Code and, therefore, petitioners have failed to timely file returns for each of the years in issue. Respondent further contends that petitioners' failure to file returns was due to willful refusal to comply with rules and regulations. We agree with respondent on both points. Courts have consistently held that a document filed as a return which does not contain sufficient information for respondent to compute and assess a tax liability is not a "valid return." *344 Commissioner v. Lane-Wells Co.,321 U.S. 219 (1944); Edwards v. Commissioner,680 F.2d 1268 (9th Cir. 1982); Cupp v. Commissioner,65 T.C. 68 (1975), affd. without opinion 559 F.2d 1207 (3d Cir. 1977). This Court has held that a return within the meaning of the statute must "state specifically the amounts of gross income and the deductions and credits claimed." Conforte v. Commissioner,74 T.C. 1160, 1195 (1980), affd. 692 F.2d 587 (9th Cir 1982). "[S]howing only a name, address, social security number, and date on a document falls far short of the information necessary to be shown on a return to enable respondent to compute and assess a tax." Cupp v. Commissioner,supra at 79. Clearly the Forms 1040 initially filed by petitioner for the years in issue did not contain sufficient information to constitute valid returns. These forms represent blanket refusals by petitioners to supply any information regarding their income and expenses cloaked in a veil of frivolous objections. Because all of the spaces provided for declaring income amounts on each of these returns contained *345 either asterisks or "OBJECT 5th," the holding in United States v. Long,618 F.2d 74 (9th Cir. 1980), is not applicable to this case. In Long, the Court of Appeals for the Ninth Circuit, to which an appeal from our decision in this case lies, held that Forms 1040 on which the taxpayers had inserted zeros in the spaces provided for declaring income constituted valid returns. In the opinion of the Ninth Circuit, the Forms 1040 in issue therein were returns because they were not blank, but instead provided information, albeit false, in the form of zeros from which some computation of tax liability was possible. [6] In this case no information was provided on the forms which would allow respondent to compute a tax liability. Accordingly, we hold that the forms were not valid returns and petitioners are therefore liable for the additions to tax imposed by section 6651(a)(1). *346 Petitioners contend that they should not be required to provide the information requested on the Form 1040 because such would violate their provilege against self-incrimination. The privilege against self-incrimination may be asserted with respect to an Internal Revenue Service form only if a taxpayer shows a "relationship between the information required on the * * * form and a real and appreciable danger of criminal prosecution at the time he was required to complete that form." Rowlee v. Commissioner,80 T.C. 1111, 1122-1123 (1983); see Hoffman v. United States,341 U.S. 479 (1951). At trial, petitioner made oblique references to past tax-related criminal charges. Petitioner did not establish any relationship between these criminal charges and the information requested on the Forms 1040 for the years in issue. Petitioners have not shown that any real and appreciable danger of criminal prosecution existed at the time they were required to complete these forms, and, therefore, are not entitled to claim the privilege against self-incrimination. The burden of proof is on petitioners to establish lack of negligence or intentional disregard of rules *347 and regulations. Bixby v. Commissioner,58 T.C. 757, 791 (1972). The filing of protester returns by petitioner for the years in issue demonstrates that he was aware of his duty to file returns. Petitioner has not alleged that he was unaware of the rules and regulations requiring him to file returns. Rather, petitioner reasserts his constitutional objections to the questions on the Forms 1040. We find these objections to be frivolous and without merit. Petitioners have not shown that their failure to timely file returns for the years in issue was due to other than negligence or intentional disregard of rules and regulations.The evidence before us clearly suggests that their failure was due to willful disregard. Accordingly, we hold that petitioners are liable for the additions to tax under section 6653(a). To reflect our conclusions with respect to the disputed issues, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Petitioners raised the same argument in a previous case before this Court. We held the argument to be without merit. Lee v. Commissioner,T.C. Memo. 1981-26, affd. without discussion of the issue 723 F.2d 1424↩ (9th Cir. 1984).
3. There is evidence in the exhibits that petitioner was actually appointed as a director of Spellbound U.S.A., Inc.'s wholly-owned subsidiary, Spellbound U.S.A. of Southfork, Inc. Petitioner's testimony and respondent's requested findings of fact, however, both treat petitioner as a vice president and director of Spellbound U.S.A., Inc. The decision in this case would be the same assuming either fact to be correct.↩
4. In his notice of deficiency and in his opening statement at trial, respondent contended that the debt had become worthless in 1976. On both direct testimony and cross examination, petitioner stated that he had lost contact with the other officers of Spellbound in 1977 and believed that the debts had become uncollectible in that year. Respondent did not challenge petitioner's statements on cross examination and on brief requested that we find as a fact that petitioner lost contact with the people operating Spellbound sometime in 1977. We therefore assume that respondent has conceded the issue.↩
5. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
6. This holding has been criticized and is not in line with the holdings of other courts. United States v. Mosel,738 F.2d 157, 158 (6th Cir. 1984); United States v. Rickman,638 F.2d 182, 184 (10th Cir. 1980); United States v. Moore,627 F.2d 830, 835 (7th Cir. 1980); United States v. Smith,618 F.2d 280, 281↩ (5th Cir. 1980).